UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Joseph Rivera,<br>    *Plaintiff*,<br><br>    *v.*<br><br>Thurston Foods, Inc.,<br>    *Defendant*. | Civil No. 3:11cv893 (JBA)<br><br><br><br>March 19, 2013 |

**RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT**

Pending before the Court are the parties' cross–motions [Doc. ## 64, 69] for summary judgment on Plaintiff's claims of race discrimination under 42 U.S.C. § 1981 (Count One), unlawful retaliation under § 1981 (Count Two), intentional infliction of emotional distress (Count Three), race discrimination under Title VII, 42 U.S.C. § 2000e *et seq.* (Count Four), retaliation under the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60 *et seq.* (Count Five), retaliation under Title VII (Count Six), and race discrimination under the CFEPA (Count Seven). These claims arise from the circumstances of Plaintiff's employment as a commercial truck driver and his termination by Defendant.

For the reasons discussed below, because Defendant has demonstrated that there are no material facts in dispute from which a jury could find in Plaintiff's favor, Defendant's motion [Doc. # 69] is granted and Plaintiff's motion [Doc. # 64] must be denied.

## I.      Factual Background

Plaintiff was hired to work at Thurston Foods as a truck driver in June 2007. Plaintiff's assertion that he was hired as a "Class A" driver because he had a Class A Commercial Driver's License (*see* Pl.'s Dep., Ex. A to Pl.'s Loc. R. 56(a)1 Stmt [Doc. # 65]), is disputed by Defendant, who contends that notwithstanding his class A license, he was hired as a "Class B" driver.[1] (*See* Ex. A to Affidavit of Patrick Thurston ("P. Thurston Aff."), Ex. 2 to Def.'s Loc. R. 56(a)1 Stmt [Doc. # 70].) The base rate of pay for Class B drivers is $140.00 per day, and $150.00 per day for Class A drivers. (*See* P. Thurston Aff., ¶ 9; *see also* Ex. B to P. Thurston Aff.) Employees who are Class A drivers are paid higher base rates because they drive trailer trucks—which are "more difficult to drive than a straight truck," which are driven by Class B drivers. (*See* P. Thurston Aff. ¶ 8.) When Class B drivers drive Class A tractor trailers, they are paid at the higher Class A base rate. (*See id.* ¶ 9.)

Patrick Thurston, the Director of Human Resources at Thurston Foods attests that "[t]he opening for which Plaintiff applied was that of a Class 'B' Driver and, at the time of his hiring, Defendant did not have any need for a Class 'A' Tractor Trailer Driver." (*Id.* ¶ 10.)   Plaintiff offers his deposition testimony to dispute Defendant's assertion that he was hired as a Class B driver, as reflected in Defendant's business record from his personnel file that he was hired a Class B driver. Absent any showing that Plaintiff had contrary documentation, or was in a position to have contrary information

---

[1] At oral argument, Plaintiff's counsel bemoaned Defendant's use of attorney–drafted affidavits to establish the summary judgment record. These affidavits are proper as statements made under oath about subjects of which the affiants have personal knowledge and are proper under Rule 56(c)(4) to show an absence of disputed material facts in the record. Here, Plaintiff has failed to put forward any rebuttal evidence, and has taken no depositions of these affiants.

as to which class driver he was actually hired as, his personal testimony is insufficient rebuttal.

### A.  Alleged Discrepancies in Pay Rate

On certain occasions when Plaintiff drove tractor trailer Class A trucks, and was to be compensated at the higher daily pay rate of $150.00, Plaintiff states that he was paid the lower rate and that he had to complain. (Pl.'s Dep. at 13.) Greg Kastukevich, Plaintiff's direct supervisor starting sometime in 2010, states that

> [t]here were times when the Plaintiff came to me and complained that, although he had driven a tractor trailer on a particular occasion, he had been paid the daily base rate of pay for driving a straight truck. On some occasions, we found that Plaintiff was right and these inadvertent errors in the Plaintiff's pay . . . were corrected. More often than not, I would adjust for the discrepancy in his pay by adding the $10.00 daily differential in pay to another day when he drove a straight truck and pay him at $150.00 instead of $140.00. I would give Payroll a copy of the Week End report . . . and then Payroll would process this Report.[2]

(Affidavit of Greg Kastukevich ("Kastukevich Aff."), Ex. 3 to Def.'s 56(a)1 Stmt ¶ 8.)

Meg Jakiela, Director of Personnel for Defendant, worked on payroll, and confirms that there were occasional "errors" with respect to Plaintiff's pay rate, stating:

> There were times when the Plaintiff came to me and complained that, although he had driven a tractor trailer on a particular occasion, he had been paid the daily base rate of pay for driving a straight truck. On some occasions we found that Plaintiff was right and this inadvertent error was corrected. . . . [I]t is my recollection that in many cases the correction was made with an upwards adjustment to the Plaintiff's incentive pay. . . . In other cases, the Plaintiff's supervisor would fix the discrepancy in the

---

[2] Later in 2010, Plaintiff asked his supervisors for more opportunities to drive the Class A trucks, which Kastukevich says he gave to him and Plaintiff agrees. (*See* Pl.'s Dep. at 17:12–15 ("[I]n June or July 2010, Greg "start[ed] to give me more runs with a class A vehicle."); *see also* Kastukevich Aff. ¶ 9.)

> Plaintiff's pay on a day when the Plaintiff drove a tractor trailer by adding
> this $10.00 daily differential in pay to another day when the Plaintiff drove
> a straight truck.

(Jakiela Aff. ¶ 10.)

On July 21, 2010, Plaintiff sent a letter to Thurston Foods' CEO Peter Malone addressing his "base pay" issue. (*See* July 21, 2010 Letter to Peter Malone, Ex. E to Pl.'s 56(a)1 Stmt.) In the letter, Plaintiff wrote:

> I was hired in July 2007 as a <u>Class "A" driver</u> with a <u>Class A License</u> by
> Andy Kastonhuber when I first started working here. . . . Several times I've
> asked for different runs and to be placed permently [sic] in a tractor
> trailer, and have always been given the run around, being put back and
> forth told I have to wait until a run opens up. Then Andy left his position
> as driver supervisor and Greg K was hired. I brought this matter to Greg's
> attention several times already, the Greg placed me in a tractor trailer
> almost every day now, but has not changed <u>my base pay rate</u>. I have
> requested my base pay rate be changed to that of a Class A driver with a
> Class A base rate pay, just like every other driver here at Thurston Foods
> who holds a Class A License as the rule book states.

(*Id.* (emphasis in original).)

After receipt of Plaintiff's letter, CEO Peter Malone and Patrick Thurston discussed Plaintiff's position. (*See* P. Thurston Aff. ¶ 14; *see also* Affidavit of Peter Malone ("Malone Aff."), Ex. 6 to Def.'s 56(a)1 Stmt ¶¶ 5–7.) Peter Malone states that

> Greg explained that, contrary to the assertion in the Memorandum, the
> Plaintiff had been hired as a Class "B" Straight Truck Driver, not as a Class
> "A" Tractor Trailer Driver and had been compensated at the correct and
> appropriate rate for this position. . . . During my conversation with Greg
> regarding the Plaintiff's Memorandum, Greg also confirmed, however,
> that the Plaintiff, most recently, had been driving a Class "A" Tractor
> Trailer with more frequency. I asked Greg if there was any reason, given
> the fact that the Plaintiff was now driving a Class "A" Tractor Trailer most
> of the time, why the Plaintiff should not be bumped up to the position of a
> Class A Tractor Trailer Driver. Greg thought this could be done and told
> me he would make the necessary arrangements and notify the Plaintiff.

4

(Malone Aff. ¶¶ 7–8.) Greg Kastukevich states that he met with Plaintiff and "told him he would be bumped up to the position of a Class "A" driver and [he] was pleased. We then adjusted his pay accordingly." (Kastukevich Aff. ¶ 15.)

Plaintiff testified at his deposition that at this time he "felt [he] was being treated differently. . . . maybe due [to his] race, [he] was being treated differently." (Pl.'s Dep. at 176.) Plaintiff also testified that

> other drivers told me that they get paid $150 a day regardless of what truck they drive, regardless of what run they're doing, whether it be a class B truck or in—what they call in the house, staying at the warehouse all day. . . They still get A rate of pay because they hold a class A license. So they don't even have to touch a truck a still receive their class A base pay.

(*Id.* at 206.) Plaintiff also noted that these "other drivers" were all white. (*Id.* at 206.)

Defendant offers unrebutted evidence that two of these employees were not paid the A rate of pay simply because they hold class A licenses. For example, Mitch Lukonis states:

> During the two year period of time when I was employed as a Class B Straight Truck Driver, I was paid the daily base pay rate for a Class B driver. When I drove a Class A truck unaccompanied, I would receive the higher daily base pay rate for a Class A driver. Upon being promoted to the position of a Class A Tractor Trailer Driver, I received the higher daily base pay rate of a Class A driver regardless of what vehicle I drove (although I rarely drove any vehicle other than a tractor trailer after assuming the position of a Class A Tractor Trailer driver).

(Affidavit of Mitchell Lukonis ("Lukonis Aff."), Ex. 8 to Def.'s 56(a)1 Stmt ¶¶ 3, 7.) Lukonis further attests that he was transferred to an "inside position" of Assistance Supervisor of Transportation in 2009, after a "work related injury." (*Id.* ¶¶ 5–6.)

Mr. Craig Fenton states that he was hired by Defendant in 1991 as a Class A Tractor Trailer Driver, and that "at the time [he] held a Class A license and had eight

years of experience driving a Class A Tractor Trailer." (Affidavit of Craig Fenton ("Fenton Aff."), Ex. 9 to Def.'s 56(a)1 Stmt ¶ 3.) As with Lukonis, Fenton states that he was paid $150.00 regardless of what vehicle he drove, though he "rarely drove any vehicle other than a tractor trailer." (*Id.* ¶ 5.) In 1995, Fenton was transferred to the position of Dispatcher, an office position, after he injured his back. (*Id.* ¶ 4.)

### B. Plaintiff's Driving Record

Defendant has the discretion, under its Employee Handbook, to terminate an employee for "careless operation of a vehicle" without prior oral or written warning. (*See* P. Thurston Aff. ¶ 22.) The Employee Handbook provides that "[a]ny driver found at fault while driving a company vehicle is subject to termination of employment." (*See* Employee Handbook, Ex. D to P. Thurston Aff. at 36.) Plaintiff was aware that careless operation of a vehicle could result in discipline. (Pl.'s Dep. at 28.)

On December 31, 2007, during his first time delivering to Defendant's customer Isaiah House, Plaintiff backed into a fence pole. (*See* Pl.'s Dep. at 26; *see also* Jan. 4, 2008 Notice of Disciplinary Action, Ex. E to P. Thurston Aff.) Andy Kastenhuber, Plaintiff's supervisor at that time, issued him a written warning, noting on the Disciplinary Action form that "[a]ny future preventable accidents will result in suspension and or termination." (Ex. E.) Defendant reported this accident to its insurance carrier and made a claim. (*see* P. Thurston Aff. ¶ 26; *see also* Ex. G to *id.*) Kastenhuber told Plaintiff that other drivers had also hit the fence pole while delivering to Isaiah House (*see* Pl.'s Dep. at 28), and not to worry, as he had previously hit the pole himself. (*See id.* at 30.)

On May 23, 2008, when making a customer delivery, Plaintiff hit the "dock bumper" and railing at West Rock Health Care. (*See* Ex. H to P. Thurston Aff.) Defendant reported this incident to its insurance carrier. (P. Thurston Aff. ¶ 48.) Plaintiff denies that

he backed his vehicle into this loading dock, and maintains that the railing was already broken, but acknowledged that the incident caused a "small dent" to his truck. (*Id.* at 32:13–14.)

On July 29, 2009, Plaintiff "collided with a window" as he was backing down an alley toward a delivery dock, causing damage to the window. (P. Thurston Aff. ¶¶ 27–28.) Plaintiff describes the incident as follows:

> This is a nursing home with an underground parking lot that has a loading area that goes down a slope and a hill to reach the loading area, so the truck has to be parked underneath the building. On the date I did the delivery there, completed my delivery, secured my truck, did a walk–around of the vehicle before I got in. . . Got into my cab, started my truck, proceeded with my paperwork. Pulled off and heard a noise, got out of the vehicle and I noticed that a patient from the building opened the window, which my truck caught.

(Pl.'s Dep. at 34–35.) This incident, too, was reported to Defendant's insurance carrier. (*See* P. Thurston Aff. ¶ 28; Ex. H to *id.*) Plaintiff received a "verbal warning" from Kastenhuber (*see* Kastenhuber Aff. ¶ 15), though he notes that he was not given any written warning after this incident. (*See* Pl.'s 56(a)2 Stmt [Doc. # 82] ¶ 52.)

On August 14, 2009, the rear door of the truck Plaintiff was driving swung open and hit the windshield of a parked car. (P. Thurston Aff. ¶¶ 27–29; Ex. J to *id.*; Pl.'s Dep. at 36–37.) As before, Defendant reported this incident to its insurance carrier. (P. Thurston Aff. ¶ 29; Ex. J to *id.*) Plaintiff testified that he complained to Defendant "about my truck not having proper hinges on it to secure the door" (Pl.'s Dep. at 36:19–20), and that "the door opened up and hit the windshield of a parked vehicle" (*id.* at 21–25.) Plaintiff received a verbal warning for this incident. (Kastenhuber Aff. ¶ 15.)

During the week of January 24, 2010, Plaintiff's truck got stuck in the mud which Plaintiff attributed to weather conditions. (Pl.'s Dep. at 38.) A "wrecker" pulled Plaintiff's

truck out of the mud (Ex. K to P. Thurston Aff.), and Plaintiff received a written warning for "careless operation of equipment," and was warned that he "has preventable incidents previously," and "[a]nother preventable accident may result in termination." (Ex. K to P. Thurston Aff.)

On February 15, 2011, a "woman claim[ed] [Plaintiff] scratched her car and did some damage to her vehicle" while making a delivery to Fowler Nursing Home. (Pl.'s Dep. at 43.) Plaintiff states that the woman's car should not have been parked in a "loading zone," and that consequently, it was in his blind spot. (*Id.* at 44.) Defendant reported this incident to its insurance carrier and made a claim (P. Thurston Aff. ¶ 37; Exs. M and N to *id*), and Kastukevich "investigate[d] this and sat with the Plaintiff and gave him an opportunity to tell me what happened." (Kastukevich Aff. ¶ 46.)

### C. Alleged Racial Incidents

On January 14, 2011, Plaintiff went to Jim Thurston, the Morning Transportation Manager, and reported an eye injury and inability to do his run that day. (Pl.'s Dep. at 205.) Plaintiff testifies that Jim Thurston responded that he "did not have a spare nigger or spic to send with [Plaintiff]." (*id.*) Though Jim Thurston recalls a conversation about Plaintiff's eye injury took place, he denies that Plaintiff asked to be excused, and states only that Plaintiff "asked me if I had a helper who could accompany him in the passenger seat." (*See* Affidavit of James Thurston ("J. Thurston Aff."), Ex. 4 to Def.'s 56(a)1 Stmt ¶¶ 5–6.) Jim Thurston states that "I told Plaintiff that I did not have a spare person from my 4:00 a.m. crew that morning who could accompany Plaintiff" (*id.*), and denies ever using any racial slurs. (*Id.* ¶ 10.)

Plaintiff claims that he left a note for Jim Thurston and Greg Kastukevich about this conversation. He left one copy of his note that stated:

> I scratched my right eye and got something[,] a piece of metal or wood, dirt, in it. I woke up with it red, itchy, and full of puss! I did not want to call out. But my vision is blurry not very safe for me to drive with one eye told Jim T was told to Tuff [sic] it out. Still have to do my run with no help. In case of accident, all personal supervisors notified.

(Ex. G to Pl.'s 56(a)1 Stmt.) He left a photocopy for Kastukevich with the following at the very bottom: "Jim Thurston also made a racial comment to me." (Ex. H to Pl's 56(a)1 Stmt.) Plaintiff explains that "I placed it on Greg's desk. . . I gave him a carbon copy of this note with the additional handwriting on the bottom." (Pl.'s Dep. at 77–78.)

Both Jim Thurston and Greg Kastukevich deny seeing the copy with the allegations of a racial comment. Jim Thurston states,

> [a]fter Plaintiff had left on this January 14, 2011 run, we discovered that he had written a note to Greg about his eye on Thurston Foods letterhead and left it on Greg's desk. . . . Greg gave me a copy of this note. Plaintiff does not complain or claim in the note that I made any racial slur or epithet to Plaintiff.

(J. Thurston Aff. ¶¶ 8–9.) Kastukevich states that "I do recall seeing a note from Plaintiff on my desk on Friday January 14, 2011 about his eye. . . . There is no claim or allegation in this note that Jim Thurston made a racial slur or epithet to Plaintiff." (Kastukevich Aff. ¶ 18.)

After he left his notes, Plaintiff claims in his deposition that he discovered a note on Kastukevich's desk saying "Change Joe's run" (Pl.'s Dep. at 80; 233), and thereafter his "run changed" and his "normal run" of the Boston, Massachusetts area was changed to a more local, Connecticut–based run. (Pl.'s Dep. at 81.) Defendant contends Plaintiff never had a "normal" or "set" run, and that "[a]t no time did any other driver have a 'normal' or set 'run' to any specific geographic area. No runs are guaranteed." (Kastukevich Aff. ¶ 37.) Kastukevich states that Plaintiff "continued on runs to the Boston, Massachusetts area

during the time period between January 14, 2011 and his termination on February 16, 2011. In fact Plaintiff's run the week of February 14th included two runs to the Boston area" (*id.* ¶ 38) and that "there was no change in Plaintiff's compensation from January 14, 2011 through his last date of employment." (*Id.* ¶ 42.)

On February 7, 2011, Plaintiff switched cellular phones with another employee, Bill Indorf, who had broken his cell phone. "Greg [Kastukevich] was getting a new cell phone and gave Bill [Indorf] the base of his old cell phone where Bill tried to use it but cannot because it's metal and it interferes with his hearing aids. Therefore, he asked to trade the phone with me, I had a plastic phone, which didn't interfere with his hearing aids. And I did so." (Pl.'s Dep. at 148–49.) On this cell phone, Plaintiff found a racist text message sent from CEO Peter Malone to Greg Kastukevich. The text said, "found this picture of our grandfathers riding their quads in the day!" and was accompanied by a photograph of two young white boys, straddling the backs of young black boys of similar age, as if riding a horse. (Ex. O to Pl.'s 56(a)1 Stmt.)

Kastukevich and Malone acknowledge the text message, though Kastukevich states that "I thought I had . . . removed this information by taking the SIM card out of my cellular phone." (Kastukevich Aff. ¶ 44.)  In a notable understatement, Malone states that "in retrospect, [the text] marked an error in [his] judgment," and said it was meant only for Kastukevich and not for sharing. (Malone Aff. ¶¶ 11–12.)  Ironically, it is Malone who states that "[w]e have a zero tolerance policy at Thurston Foods for discrimination and retaliation" (*id.* ¶ 14), and he is "very proud of the diverse employee base we have at Thurston" (*id.* ¶ 13). Plaintiff never told anyone about the text message when he found it.

### D.  Plaintiff's Termination

Plaintiff was terminated on February 16, 2011 by Patrick Thurston (*see* P. Thurston Aff. ¶ 39), one day after the Fowler Nursing Home incident because he was a careless driver and was no longer "insurable." (Pl.'s Dep. at 52, 54.) Plaintiff claims that he was terminated in retaliation for complaining about the racist slurs by Jim Thurston, and for complaining about his runs on January 25, 2011 and February 5, 2011 which exceeded the legal limits on hours driven.

## II.     Discussion[3]

Plaintiff asserts that he has been subjected to unlawful discrimination, a hostile work environment, and retaliation on the basis of his race, in violation of 42 U.S.C. § 1981, Title VII, and the CFEPA, and that he has suffered intentional infliction of emotional distress. Plaintiff moves for summary judgment on all counts, and Defendant cross–moves, arguing that because Patrick Thurston was the only decisionmaker with respect to his employment, Plaintiff cannot succeed as a matter of law on any of his claims.

---

[3] "Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

## A.  Employment Discrimination Claims

Employment discrimination claims under the CFEPA, § 1981, or Title VII are all analyzed using the same substantive standards. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) ("The substantive standards applicable to claims of employment discrimination under Title VII . . . are also generally applicable to claims of employment discrimination brought under § 1981."); *Levy v. Comm'n on Human Rights & Opportunities,* 236 Conn. 96, 107–08 (1996) (using the *McDonnell Douglas* standard for Conn. Gen. Stat. § 46a-60); *see also Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004); *Brennan v. Metropolitan Opera Association, Inc.,* 192 F.3d 310, 316 n.2 (2d Cir. 1999).

### 1.  Intentional Race–Based Termination (Counts One, Four, and Five)

A plaintiff's prima facie claim of unlawful employment discrimination requires showing that (1) he is a member of a protected class, (2) he was qualified for the job, (3) he suffered an adverse employment action, and (4) the action occurred under circumstances that give rise to an inference of invidious discrimination. *McDonnell Douglas Corp. v. Green. See* 411 U.S. 792, 802–04 (1973).

#### a.  Prima Facie Case

It is undisputed that Plaintiff makes out the first three elements of his prima facie case: (1) he is Hispanic, and thus a member of a protected class, (2) he was qualified for the class A or class B driver position, and (3) he suffered an adverse employment action in that he was terminated.[4]

---

[4] Plaintiff also maintains that he suffered another adverse employment action, "unequal pay." (*See* Pl.'s Mem. Supp. [Doc. # 67] at 14.) However, the record contains no evidence that he was paid differently than other Class B drivers, and once he was switched to a Class A driver position, he was paid the same daily rate as all Class A drivers.

For the fourth element, Plaintiff points to the "direct evidence" of the January 14, 2011 "racist comment" from Jim Thurston, and the racist text message from CEO Peter Malone to Greg Kastukevich.

With respect to Jim Thurston's racist comment, Defendant hotly disputes that the comment was ever made, and thus it is not an undisputed fact for either party's summary judgment record. Defendant also insists that the racist comment made by Jim Thurston should be given no weight, arguing that it is merely a "stray" remark. The Court disagrees. Though the existence of the remark is disputed, if credited, it shows race–based disrespect made by a supervisor to Plaintiff in the workplace about which Plaintiff complained. The Court considers it along with the other facts in the record in evaluating Plaintiff's discrimination claims.

However, "remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision–maker was motivated by the discriminatory sentiment expressed in the remark." *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007); *cf. Rose v. New York City Bd. Of Educ.*, 257 F.3d 156, 162 ("Young's alleged statements to [plaintiff] were not the stray remarks of a colleague but rather were comments made directly to her on more than one occasion by her immediate supervisor, who had enormous influence in the decision–making process."). Here, the summary judgment record shows no causal relationship between Jim Thurston's remark and Patrick Thurston's decision to terminate Plaintiff because he was "no longer insurable." *See Tomassi*, 478 F.3d at 116 ("The relevance of discrimination–related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision–maker was motivated by assumptions or attitudes relating to the protected class."). Thus, Jim Thurston's remarks provide no

support for an inference that Patrick Thurston was motivated by Plaintiff's race when he decided to terminate Plaintiff. Similarly, the racially offensive text is not shown to have any relation to Patrick Thurston and his decision to terminate Plaintiff.[5]

Plaintiff's surmise, raised at oral argument, that in this small, family–owned company, every one of the family member–managers had a say in an employee's termination, is just that—a surmise without any evidentiary support. It is insufficient to rebut the evidence presented in the record that Patrick Thurston made the decision to terminate Plaintiff, and thus, Plaintiff has failed to offer any evidence that his termination occurred under circumstances giving rise to an inference of invidious discrimination and his prima facie case fails on his termination claim.

   b. Legitimate Non–Discriminatory Reason and Pretext

Even if Plaintiff could make out a prima facie case, Defendant's summary judgment record states a legitimate, non–discriminatory reason for Plaintiff's discharge: his driving record while at Thurston foods which made him "no longer insurable." The record shows multiple incidents of damage to Plaintiff's vehicle and the property of others, memorialized in four written and oral warnings. Despite Plaintiff's explanations of the circumstances leading to these incidents, he has not shown that Defendant's business reasons for terminating him were pretextual such that reasonable jurors could conclude that he was terminated because of his race. Defendant's motion for summary judgment as

---

[5] Referring to the racist text message, Plaintiff notes in his opposition that a reasonable jury could "infer that any supervisor who implemented policies on behalf of the employer were based on this expressed discriminatory animus." (Pl.'s Mem. Opp'n [Doc. # 83] at 18.) However, as discussed above, Plaintiff concedes that he did not report the receipt of the discriminatory text message to anyone at work, and thus, Plaintiff cannot show how the text message—a private text message that was not directed at him— played any role in his termination.

to Plaintiff's intentional discrimination claims is therefore granted and Plaintiff's is denied.

### 2. Hostile Work Environment (Counts One, Four, and Five)

Plaintiff also asserts that he was subjected to a hostile work environment at Thurston Foods. A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted). Conduct that is "merely offensive," and "not severe or pervasive enough to create an objectively hostile or abusive work environment [meaning] an environment that a reasonable person would find hostile or abusive [ ] is beyond Title VII's purview." *Id.*  Relevant considerations for a hostile work environment claim include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23 (cited in *Pucino v. Verizon Wireless Communications, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010)). As evidence of a racially hostile work environment that he claims "occurred over a period of time stretching back to the day he was hired in 2007" (*see* Pl.'s Mem. Supp. at 16), Plaintiff points to the same two pieces of "direct evidence" discussed *supra*.

Frequent racial slurs can certainly constitute evidence that renders a work environment both subjectively and objectively racially hostile. *See Torres v. Pisano*, 116 F.3d 625, 632–33 (2d Cir. 1997) ("[A] reasonable Puerto Rican would find a workplace in which her boss *repeatedly* called her a "dumb spic" and told her that she should stay home, go on welfare, and collect food stamps like the rest of the "spics" to be hostile.

Torres has therefore established a strong prima facie case of sexual harassment.")
(emphasis added); *Petrosino v. Bell Atlantic*, 385 F.3d 210, 222 (2d Cir. 2004) (finding that
the district court had erred in granting summary judgment to employer where "[s]uch
workplace disparagement of women, *repeated day after day over the course of several years*
without supervisory intervention, stands as a serious impediment to any woman's efforts
to deal professionally with her male colleagues.") (emphasis added); *Terry v. Ashcroft*, 336
F.3d 128, 149 (2d Cir. 2003) ("[P]laintiff is not complaining merely about sporadic and
isolated events, but rather about his daily working conditions."); *Pucino*, 618 F.3d at 119
(concluding that plaintiff presented issues of disputed fact sufficient to withstand
summary judgment where her affidavit stated that the alleged abuse concerning "most of
the major aspects of Pucino's employment," including "[w]ork assignments, the provision
of tools, the use of a bucket truck, the issues as to use of restrooms, and the verbal abuse"
occurred "constantly" or "frequently").  Here, the racist comment by Jim Thurston and
the racist text message, while offensive, constitute two isolated incidents insufficient to
support a hostile work environment claim. No reasonable juror could find that these
incidents constituted "pervasive harassment" or resulted in a workplace "permeated with
discriminatory intimidation . . . sufficiently severe or pervasive to alter the conditions" of
Plaintiff's employment. Thus, Defendant's motion for summary judgment as to the
hostile work environment claim is granted and Plaintiff's is denied.

### 3. *Retaliation (Counts Two, Six, and Seven)*

Plaintiff claims retaliation based on his protected complaint activities. To establish
a prima facie case of retaliation, Plaintiff must show that (1) he participated in protected
activity, (2) he suffered an adverse employment action, and (3) a causal connection exists
between his protected activity and his adverse employment action. *Dixon v. Int'l Fed'n of*

16

*Accountants*, 416 F. App'x 107, 110 (2d Cir. 2011). "Even if a plaintiff sets forth a *prima facie* case, however, this establishes only a rebuttable presumption of retaliation, and where the defendant identifies a legitimate, non–retaliatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's articulated reason is a pretext for retaliation." *Id.* Although the presumption of discrimination "drops out of the picture" if the Defendant articulates a legitimate, non–discriminatory reason, "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case "and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual," *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000).

a.   Protected Activity[6]

Plaintiff claims two specific protected activities: when he complained to CEO Peter Malone about his pay rate (Pl.'s Mem. Supp. at 23), and when he left the written complaint for Greg Kastukevich reporting Jim Thurston's comment (*id.* at 25; *see also* Ex. G to Pl.'s 56(a)1 Stmt).

As an initial matter, Plaintiff's July 2010 memo to Peter Malone about his pay rate made no mention of discriminatory treatment on the basis of race. Further, Plaintiff himself testified that he does not think that his July 2010 complaint had anything to do

---

[6] There is some evidence from Plaintiff's deposition that Fenton and Lukonis told Plaintiff to "falsify his logbooks," and also Plaintiff was terminated for complaining about driving over the legal time limits for truck drivers. Though this evidence is disputed by Defendant, even viewing the record in Plaintiff's favor, it is not probative of Plaintiff's claims of disparate treatment based on race or of Plaintiff's race–based retaliation claims.

with his termination. (*See* Pl.'s Dep. at 171–72.) Thus, this activity cannot serve as "protected activity" for his Title VII, § 1981, and CFEPA retaliation claims. However, Plaintiff's complaint to Greg Kastukevich about Jim Thurston's racist comment obviously constitutes a protected activity.

### b.   Adverse Employment Action

Plaintiff claims that his compensation change due to the change in his run and his termination constitute adverse employment actions.[7] Plaintiff's termination is clearly an adverse employment action, and satisfies this prong.

However, as to Plaintiff's claim of lowered compensation due to his changed route, Plaintiff offers his own deposition testimony that after he complained about Jim Thurston's racist comment, he saw a note on Kastukevich's desk to "change Joe's route." However, Plaintiff has presented no evidence to rebut Defendant's record that he suffered no loss in wages, and that he, like all other Thurston drivers, was not entitled to any particular "run." Thus, only his termination remains for consideration as retaliatory adverse action.

---

[7] Plaintiff also claims that Patrick Thurston's disclosure of his driving incidents to a potential future employer in March 2011, upon being contacted as a reference, and Patrick Thurston's refusal to reinstate him, also in March 2011, should be considered adverse actions in retaliation for his protected activity of filing a charge of discrimination with the EEOC and the CHRO. However, both of these claimed adverse actions predate plaintiff's April 11, 2011 filings with the EEOC and the CHRO, and thus, cannot provide the basis for a retaliation claim.

c.   Causal Connection

Viewing the record in the light most favorable to Plaintiff as the non–moving party, Plaintiff's complaint about Jim Thurston's remark occurred a month prior to his termination. While this relatively close temporal proximity between the protected activity and the adverse action could support an inference of causal relationship, particularly where Plaintiff's record of prior driving incidents and discharge warnings never generated any adverse action by Defendant, there is a significant intervening event—the February 15, 2011 Fowler Nursing Home incident. As that incident alone gave Defendant grounds to terminate Plaintiff, this intervening event dispels an inference of a causal relationship between the protected activity and Plaintiff's termination, thus defeating Plaintiff's prima facie case of unlawful retaliation. *See Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("In this Circuit, an inference of causation is defeated . . . if . . . there was an intervening causal event."). Plaintiff's motion is therefore denied, and Defendant's motion is granted.

### B.  IIED (Count Three)

In order to prevail on a claim for the intentional infliction of emotional distress in Connecticut, a plaintiff has the burden of establishing four elements:

> It must be shown: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe.

*Petyan v. Ellis*, 200 Conn. 243, 253 (2006). "Liability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by decent

19

society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Ancona v. Manafort Bros., Inc.*, 56 Conn. App. 701, 712 (2000). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Carrol v. Allstate Insurance Co.*, 262 Conn. 433, 443 (2003).

Of the conduct alleged by Plaintiff—being "forced" to drive over the legal driving hours limit (but then being allowed to catch up on sleep the next day); Jim Thurston's racial slur; two non–managerial employees telling Plaintiff to "falsify" his logbooks; and the racist text message—there is no evidence in the record that would permit a reasonable juror to conclude that the actors intended to inflict emotional distress on Plaintiff, or that they "knew or should have known" that emotional distress was likely as a result of their conduct. Even the tasteless, racially tainted text message was meant exclusively for private consumption. The fact that it was accidentally "leaked" to Plaintiff, who was undisputedly not the intended audience, means that the first prong, requiring intentional or reckless action, cannot be satisfied, and thus, Defendant is entitled to summary judgment on the IIED claim.

### III.     Conclusion

For the reasons discussed above, Defendant's motion [Doc. # 69] for summary judgment is GRANTED and Plaintiff's motion [Doc. # 64] for summary judgment is DENIED. The Clerk is directed to close the case.


IT IS SO ORDERED.

         /s/
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 19th day of March, 2013.